**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**Yolanda Arnold,**

      **Plaintiff,**

   **v.**                                  **Case No. 2:08–cv–0031**

**The City of Columbus,**             **Judge Michael H. Watson**

      **Defendant.**

## OPINION AND ORDER

This is an employment discrimination and retaliation case brought by an officer with the Columbus Division of Fire, and arising in large part out of a series of investigations that were conducted into allegations of wrongdoing within the Columbus Division of Fire's Fire Prevention Bureau. Plaintiff asserts that she was discriminated against on the basis of her race, retaliated against for complaining of discrimination, and subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and Ohio Revised Code § 4112.02. Plaintiff also asserts that she was retaliated against for engaging in speech protected by the First Amendment, and that Defendant violated her right to equal protection as guaranteed by the Fourteenth Amendment to the U.S. Constitution. Finally, Plaintiff asserts that Defendant portrayed her in a false light, spoliated evidence, and destroyed public records in violation of Ohio law. Defendant moves for summary judgment on all of Plaintiff's claims. Def.'s Mot. Summ. J., ECF No. 81. For the reasons that follow, the Court grants Defendant's summary judgment motion.

## I. FACTUAL BACKGROUND[1]

Plaintiff, Yolanda Arnold, ("Plaintiff") is an African-American female who was

employed as a Battalion Chief by the Columbus Division of Fire.  Plaintiff brings this

action against the City of Columbus ("Defendant" or the "City"), which operates the

Columbus Division of Fire ("CDF").

The chain of command within the CDF, in descending order of seniority, is as

follows: Assistant Chief ("AC"), Battalion Chief ("BC"), Captain ("Capt."), Lieutenant

("Lt."), Firefighters.  Above the level of Assistant Chief are two positions, the Executive

Officer ("XO"), second in command to the Fire Chief, and the Fire Chief, the highest

ranking position in the CDF.  The Safety Director for the City of Columbus ("Safety

Director") is the administrative head for the CDF, as well as for the Division of Police

and Support Services.

Plaintiff was first hired by the CDF as a firefighter on March 28, 1983, and was

the first African-American female to be promoted to the rank of Lieutenant, Captain,

and Battalion Chief.  Second Am. Compl. ¶¶ 4, 6, ECF No. 71.  In September 2002,

Plaintiff was assigned to the Fire Prevention Bureau ("FPB") as Battalion Chief.  Pl.'s

Corrected Opp'n to Def.'s Mot. Summ. J. ("memorandum in opposition" or "Pl.'s Mem.

Opp'n") Page ID #5015, ECF No. 153.  The FPB is one of five Bureaus of the CDF,

and, in turn, is divided into three sections: Investigation (which includes Arson),

---

[1]The Court notes that it is somewhat difficult to distill the relevant background facts of this case from Plaintiff's Corrected Opposition to Defendant's Motion for Summary Judgment, ECF No. 153.  The "Statement of Facts" section of Plaintiff's memorandum, for instance, sets forth numerous "facts" that are unsupported by citations to evidence in the record, and thus are more accurately characterized as arguments.  Plaintiff's "Statement of Facts" also omits certain of the basic facts underlying her claims.  Certain of the following facts, not disputed by Plaintiff, thus are taken from the affidavits, and exhibits thereto, attached to Defendant's Motion for Summary Judgment, ECF Nos. 81–1 through 81–6.

Inspection (which includes Plans Review), and Community Relations. As Battalion

Chief in the FPB, Plaintiff was responsible for the day-to-day operations of all sections

of that Bureau. Pl.'s Mem. Opp'n Page ID #5012, 5015. She reported to an Assistant

Chief, who had overall responsibility for the Bureau. *Id.* at Page ID #5012. Plaintiff

first reported to AC Gregory Paxton ("Paxton"), the head of the FPB from October 2002

to May 2005, and then to AC Karry Ellis ("Ellis").

## A. The events leading to Plaintiff's suit

Plaintiff's claims in this action arise primarily from three investigations the CDF

initiated in 2004 and 2005 involving the FPB and, more specifically, the FPB's

Inspection section. Three related cases are also currently before this Court, in which

the plaintiffs, also members of the FPB, bring similar claims of race (or race

association) discrimination, hostile work environment, retaliation, First and Fourth

Amendment violations, and invasion of privacy, based largely on those investigations.[2]

Most of the firefighters in the FPB Inspection section are African-American. Pl.'s Mem.

Opp'n Page ID #5013. According to Plaintiff, the FPB Inspection section is the only

department in the CDF that is staffed almost exclusively with African-American officers.

*Id.*

The investigations at issue began in August 2004, and concern allegations that

FPB inspectors missed scheduled building inspections. CDF and the Columbus

Department of Development, Building Services ("Building Services") conduct building

inspections in conjunction with each other. CDF's inspections are based on the Fire

---

[2] *Eddie Arnold, et al. v. City of Columbus,* 2:08–cv–262; *Fullen v. City of Columbus,* 2:08–cv–263; *Maxwell, et al. v. City of Columbus,* 2:08–cv–264.

Code and Building Services' inspections are based on the Building Code. Building Services schedules the inspections, and then notifies the FPB of the appointment times. According to Plaintiff, there is conflict between the two entities; or, as she puts it, "Building Services [has] a longstanding beef with the [FPB] inspectors." Pl.'s Mem. Opp'n Page ID #5028 n.12.

In August 2004, Paxton and Plaintiff received an email from a lieutenant in the FPB, Lt. Randal Daum, that "CDF [was] not being informed of all inspections" scheduled by Building Services. *Id.* at Page ID #5027; Email from R. Daum to Y. Arnold and G. Paxton dated Aug. 2, 2004, ECF No. 125–10. According to Paxton, he also was made aware in August 2004 of two specific instances of "missed inspections—one by Inspector Virgil Moore, and one by Inspector Melvin Hoston." Paxton Aff. ¶ 3, ECF No. 81–1. Paxton replied to Lt. Daum's concerns by stating that he would "be meeting with [Joe Busch, of Building Services] [that] week," and would "bring the issue up." Email from G Paxton to Y. Arnold and R. Daum dated Aug. 3, 2004, ECF No. 125–10. In their meeting, Busch informed Paxton that there were "considerably more than two missed inspections." Paxton Aff. ¶ 3, ECF No. 81–1. More specifically, when Paxton stated that he was aware of two missed inspections, Busch "started to laugh and said it was more like 42 missed inspections." CDP Informational Investigative Report, at Page ID #2988, ECF No. 125–27. According to Paxton, his discussion with Busch "also suggested the possibility" that the FPB inspectors were paid overtime for conducting inspections that they actually missed. Paxton Aff. ¶ 3, ECF No. 81–1. Paxton informed XO Richard Braun ("Braun") of what he had been told by Busch and of the potential problems in the FPB. From there,

Braun directed the CDF's Professional Standards Unit ("PSU") to investigate and report on the allegations of missed inspections (the "PSU investigation").  Additionally, in late 2004, Safety Director Mitchell Brown ("Brown") directed the Columbus Division of Police ("CDP") to conduct an investigation regarding the related, possibly criminal allegations that FPB inspectors received overtime for inspections that were not performed (the "CDP investigation").

Plaintiff agrees that the allegations were made and the investigations commenced as described above.  She states, however, that the allegations were "baseless," and contends that Paxton essentially seized upon them as a "chance to discredit the Plaintiff inspectors."  Pl.'s Mem. Opp'n Page ID #5017, 5028.  According to Plaintiff, Paxton acted with racial animus, wrongfully "'call[ing]' for the [investigations] without doing a single bit of initial investigation himself," as "he ought to have done in his role [as] head of FPB and as an AC."  *Id.* at Page ID #5028.  She alleges that this was part of a plan Paxton had "with Building Services to get the FPB inspectors' department gutted," that is, to remove the FPB from the business of doing inspections.  *Id.* at Page ID #5017, 5028.

The PSU investigation concluded in February 2005, and in May 2005, XO Braun presented his findings.  Braun concluded that "there appears to have been a failure in the procedure to assign and follow up on inspections."  Pettus Aff. ¶ 4 and Ex. 1, ECF No. 81–4.  He recommended that "a quarterly review of the current system should be made with any appropriate changes made," and that "[i]nspectors should be spot checked to make sure that inspections are being done."  *Id.*  The CDP investigation concluded in March 2005 and did not find evidence of criminal

wrongdoing.  The allegations of missed inspections drew considerable media coverage and negative attention to the CDF.

On May 4, 2005, Plaintiff sent a memorandum to Chief Pettus entitled "Disparate Treatment and Policy Violations," in which, *inter alia*, she complained of disparate treatment, particularly on the part of Paxton and with regard to the allegations of missed inspections, and of Paxton's excessive absences from the office. Pl.'s Mem. Opp'n Page ID #5017; Mem. from Y. Arnold to N. Pettus dated May 4, 2005, ECF No. 126–18.  Pettus had also observed "considerable conflict and hostility between different employees of FPB."  Pettus Aff. ¶ 3, ECF No. 81–4.  In particular, according to Pettus, Paxton and Plaintiff "the two highest ranking officers in FPB, appeared to be in fairly regular conflict."  *Id.*

After receiving Plaintiff's memorandum, Pettus requested further investigation into the problems in the FPB, including the allegations of discrimination by Plaintiff. According to Pettus, he requested a third investigation because "[i]n light of the ongoing conflict in the FPB, the alleged missed inspections, and [Plaintiff's] claims of discrimination, [he] concluded that the PSU investigation had lacked the necessary scope and depth to adequately assess the potential problems and deficiencies that appeared to exist in FPB."  *Id.* at ¶ 4.  He therefore asked Brown, his boss, "to consider further investigation to assess and address the problems in FPB."  *Id.*  The City then contracted with a third party, labor law attorney Pamela Krivda ("Krivda"), to conduct an investigation regarding the allegations of missed inspections, and the allegations of conflict within the FPB, including Plaintiff's allegations of race and gender discrimination (the "Krivda investigation").  According to Plaintiff, such an investigation

by a third party was "unprecedented." Pl.'s Mem. Opp'n Page ID #5017. Krivda completed the report of her investigation in September 2006.

Plaintiff's claims also arise in part from a disciplinary suspension she received during the time frame of the investigations, which arose as follows. According to Plaintiff, while the PSU and CDP investigations were underway, she discovered that records relating to the allegedly missed inspections were missing from the FPB, and she believed that Lt. Daum had taken them. Pl.'s Mem. Opp'n Page ID #5018. In April 2005, Plaintiff reported to her superiors that Lt. Daum refused to return documents he had taken from the FPB. A PSU investigation into the matter followed. In June 2005, during a PSU interview, Plaintiff stated that two individuals, Rhonda Sipe ("Sipe") and Firefighter James Sawyers ("Sawyers"), had witnessed Lt. Daum removing the records from the FPB. Lt. Daum denied taking the records at issue. Both Sipe and Sawyers were interviewed and denied any knowledge of Lt. Daum removing the documents. The allegation against Lt. Daum was ultimately determined to be "Not Sustained."

On June 1, 2006, due to her allegations that Sipe and Sawyers had witnessed Lt. Daum removing documents, Plaintiff was charged with Dishonesty and a violation of the Additional Standards of Conduct for Supervisors and Administrators, and ordered to report to Chief Pettus for a disciplinary hearing. At the disciplinary hearing on July 10, 2006, Chief Pettus sustained the charges, recommended an eighty-hour suspension, and ordered Plaintiff to be reassigned from the FPB to an assignment to be determined. In September 2006, Plaintiff was transferred from the FPB to the Emergency Services Bureau. On November 21, 2006, Plaintiff, represented by counsel, appeared before Safety Director Mitchell Brown for another hearing on the

disciplinary matter. On January 5, 2007, Brown sustained the charges and upheld Chief Pettus' recommendation of an eighty hour suspension and removal from the FPB. Plaintiff appealed Brown's decision to the Civil Service Commission, which modified the charge from dishonesty to "lack of diligence" and reduced her suspension from eighty to forty hours.

Plaintiff filed her first Complaint in this matter on January 11, 2008, an Amended Complaint on April 23, 2008, and a Second Amended Complaint on January 1, 2010. ECF Nos. 2, 3, 71. In her Second Amended Complaint, Plaintiff asserts the following employment discrimination claims pursuant to Title VII of the Civil Rights Act of 1964 and Ohio Revised Code § 4112.02: (1) race discrimination, (2) hostile work environment, and (3) retaliation and retaliatory harassment. Second Am. Compl. ¶¶ 90–101, ECF No. 71. Additionally, Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 for retaliation for engaging in conduct protected by the First Amendment, and for violations of the Fourteenth Amendment's equal protection guarantee. *Id*. at ¶¶ 102–105. Finally, Plaintiff asserts state law claims for invasion of privacy/false light, spoliation of evidence, and the removal or destruction of public records. *Id*. at ¶¶ 106–111.

The Court has jurisdiction over Plaintiff's Title VII and § 1983 claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## II. SUMMARY JUDGMENT

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a), which provides: "The court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the nonmoving party's claim. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009). Under Rule 56©, the party asserting that a fact cannot be or is genuinely disputed must support the assertion by either "citing to particular parts of materials in the record," or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). In responding to a summary judgment motion, the non-moving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Id.*; *see also Steward v. New Chrysler*, No. 08-1282, 2011 WL 338457, at *7 (6th Cir. Feb. 4, 2011) ("At this stage in the litigation, a plaintiff may no longer rely solely on her pleadings, but must come forward with 'probative evidence tending to support the complaint.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "Essentially, a motion for summary judgment is a means by which to "challenge the opposing party to 'put up or shut up' on a critical issue." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995) (quoting *Street v. J.C. Bradford &*

Co., 886 F.2d 1472, 1477 (6th Cir. 1989)). The Court must grant summary judgment if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Matsushita*, 475 U.S. at 588 (1986); *Petty v. Metro. Gov't. of Nashville-Davidson Cnty.*, 538 F.3d 431, 438–39 (6th Cir. 2008).

When reviewing a summary judgment motion, the Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). It is not the obligation of the court to comb the record to find evidence or testimony establishing a party's case. *See Nerswick v. CSX Transp., Inc.*, 692 F. Supp. 2d 866, 882 (S.D. Ohio 2010) (citing *Street*, 886 F.2d at 1479–80); *see also Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000); *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d. 479, 487 (6th Cir. 2006). The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Reeves*, 530 U.S. at 150–51. Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Thus, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*,

328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson,* 477 U.S. at 251–52).

## III. DISCUSSION

As a preliminary matter, the Court notes that many of Plaintiff's arguments are

somewhat difficult to conceptualize from her memorandum in opposition. The

memorandum is rather haphazard in organization, with the arguments supporting any

one particular claim often scattered across various sections. In its discussion, the

Court will attempt to organize and focus these disparate threads of Plaintiff's

arguments.

In addition, Plaintiff does not appear to appreciate the extent of her burden in

responding to Defendant's motion for summary judgment, and spends considerable

effort arguing that Defendant did not carry its initial burden to disprove her case.

Plaintiff seemingly filed to the docket nearly every piece of discovery obtained in these

four related cases, including nearly three dozen depositions and nearly two hundred

exhibits. Plaintiff, however, failed to cull this discovery and provides few cites to

specific pieces of evidence in support of her allegations and claims.[3] The Court

---

[3]The Court notes that in her memorandum in opposition, Plaintiff argues that "[d]iscovery in all four [related] cases has been an odyssey," that "[t]here is a veritable grocery list of documents requested by Plaintiffs but not produced by Defendant," and that Defendant "actually removed or destroyed records that were pertinent to all Plaintiffs['] claims in these [related] cases." Pl.'s Mem. Opp'n Page ID #5014. Plaintiff argues that she is "entitled to an adverse inference relating to the documents not produced or destroyed." *Id.* The record does not reflect, however, that Plaintiff filed any motions to compel the production of documents during discovery. Additionally, even assuming that spoliation occurred, Plaintiff does not argue that a sanction or remedy for the spoliation is appropriate. *See, e.g., Strong v. U-Haul Co. of Mass.,* No. 1:03-cv-00383, 2006 WL 5164822, at *3 (S.D. Ohio Dec. 28, 2006) (discussing factors courts consider in determining whether to sanction the spoliating party). Additionally, Plaintiff does not submit an affidavit pursuant to Federal Rule of Civil Procedure 56(d), showing that she cannot present facts essential to justify her opposition to summary judgment and requesting additional time for discovery or another appropriate order. To the contrary, Plaintiff explicitly represents in her memorandum in opposition that "[d]espite these [discovery] obstacles," "Plaintiffs have marshaled abundant evidence to support their claims under the laws of the United States and Ohio." Pl.'s Mem. Opp'n Page ID #5014.

reiterates that it has no duty "to comb the record to find evidence or testimony

establishing a party's case." *Nerswick*, 692 F. Supp. 2d. at 882. Rather, Plaintiff, as

the non-moving party, has an affirmative duty to direct the Court's attention to those

specific portions of the record upon which she seeks to rely to create a genuine issue

of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## A. Race discrimination

Plaintiff asserts she was the victim of employment discrimination in violation of

Title VII of the Civil Rights Act of 1964 ("Title VII") and Ohio Revised Code Chapter

4112. Title VII prohibits employers from "discriminat[ing] against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Similarly, Ohio Revised

Code Chapter 4112 prohibits employers from discriminating against any person with

respect to the "terms, conditions, or privileges of employment, or any matter directly or

indirectly related to employment," on the basis of that person's race. Ohio Rev. Code

§ 4112.02(A). A claim for race discrimination under Ohio Revised Code § 4112.02(A)

is evaluated using the same analytical framework as a Title VII claim. *See Allen v.*

*Ohio Dep't of Job & Family Servs.*, 697 F. Supp. 2d 854, 880 (S.D. Ohio 2010).

Plaintiff may prove that she was subject to disparate treatment based on race in

violation of Title VII using either direct or circumstantial evidence. *See, e.g., Upshaw*

*v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). Plaintiff specifically argues in her

memorandum in opposition that she has established a prima facie case of race

---

Thus, to the extent Plaintiff may have attempted to imply in complaining about the discovery process that
she cannot present facts essential to justify her opposition to summary judgment, she has expressly
waived such a claim.

discrimination using circumstantial evidence.  She does not state that she seeks to prove her claim using direct evidence.  Nonetheless, because Plaintiff does seem to attempt to offer such direct evidence at two points in her memorandum in opposition, the Court will analyze Plaintiff's claim under both the direct and indirect method of proof.

### 1. Direct evidence

In discrimination cases, direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).  "[D]irect evidence of discrimination does not require a factfinder to draw any inferences" as to discriminatory motive. *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

Although Plaintiff does not plainly articulate these arguments, she seems to offer a statement by Virgil Moore as an attempt to establish direct evidence of race discrimination with regard to the PSU and CDP investigations, and a statement by Judy Evergin as an attempt to establish direct evidence of race discrimination with regard to her forty-hour suspension.  The Court will address each statement in turn.

### a. Direct evidence—the PSU and CDP investigations

As a preliminary matter, the Court notes that Plaintiff's Title VII claim of race discrimination based on the PSU and CDP investigations is time barred because she did not timely file an EEOC charge regarding these two investigations.  The Court

addresses this in detail in Section III(A)(2)(a), below.[4]

For the purposes of her race discrimination claim under Ohio Revised Code § 4112.02, however, Plaintiff's purported direct evidence regarding these investigations is hearsay, and as such, not admissible at the summary judgment stage. *Jacklyn*, 176 F.3d at 927 ("Hearsay evidence may not be considered on summary judgment.").

Plaintiff alleges that Paxton instigated the PSU and CDP investigations out of racial animus.[5] Specifically, Plaintiff alleges that "Paxton had been working with Building Services to get the FPB inspectors' department gutted," and that it was Paxton's "mission" to "'get' the black [FPB] inspectors out of the picture and replace them with civilian inspectors." Pl.'s Mem. Opp'n Page ID #5017, 5028. In support of that allegation, Plaintiff offers the testimony of Virgil Moore ("Moore"), a firefighter in the FPB Inspection section and a plaintiff in the related case *Maxwell, et al. v. City of Columbus*, Case No. 2:08–cv–264. In his deposition, Moore stated that Stacy Miller ("Miller"), a local business owner, told Moore that in the course of a conversation between Paxton, Miller, and the bar owner at a local bar, Paxton stated, referring to Plaintiff, "we need to get the n[****]r out of there." Moore Dep. 82–85, ECF No. 116. Plaintiff offers Moore's testimony regarding Miller's alleged statement about Paxton's alleged statement for the truth of the matter asserted, that is, to prove Paxton made the statement demonstrating racial animus. Paxton has attested that he did not make

---

[4]Also as addressed in Section III(A)(2)(a) below, Plaintiff's claim of race discrimination in violation of Ohio Rev. Code § 4112.02 based on these two investigations is not time-barred, as Ohio law does not require an EEOC/OCRC charge as a prerequisite to filing suit, and provides for a different limitations period.

[5]It is unclear from Plaintiff's memorandum in opposition whether her allegation refers to the PSU or CDP investigation, or both. Since both investigations concerned the allegations of missed inspections, the Court presumes her allegation pertains to both.

the alleged statement. Paxton Aff. ¶ 4, attached to Def.'s Reply, ECF No. 162–1.

Moore's testimony regarding Miller's statement to Moore about what Paxton said in a

conversation with Miller is double hearsay. *See* Fed. R. Evid. 801© ("'Hearsay' is a

statement, other than one made by the declarant while testifying at the trial or hearing,

offered in evidence to prove the truth of the matter asserted."). Moreover, even if

Miller's statement to Moore was not considered hearsay or fell under a hearsay

exception—even if, for example, it could be considered to be admission by a party

opponent or a statement of Paxton's state of mind—in order for Moore's statement

about Miller's statement about Paxton's statement to be admissible, Moore's statement

would also have to fall under a hearsay exception. *See United States v. Gibson*, 409

F.3d 325, 337 (6th Cir. 2005) ("in order for double-hearsay statements to be

admissible, both statements must be excluded from the hearsay definition"). Plaintiff

does not argue that either statement is not hearsay, or that a hearsay exception

applies to either statement.

### b. Direct evidence—forty-hour suspension

Plaintiff also seems to attempt to offer direct evidence of discrimination with

regard to her forty-hour disciplinary suspension. Specifically, Plaintiff alleges that

Safety Director Mitchell Brown, who is African-American and who sustained the

charges and discipline against her, stated at some point that he was "harder on blacks

than he was on whites" so he would not be accused of showing bias. Pl.'s Mem.

Opp'n Page ID #5035. In support of that allegation, however, Plaintiff again offers only

inadmissible hearsay. As evidence of Brown's statement, Plaintiff points to the

affidavit of Judy Evergin ("Evergin"), a Lieutenant with the CDF. In particular, Plaintiff

points to Evergin's statement that Charleta Tavares ("Tavares"), a Columbus City

Councilwoman, told Evergin that Brown had stated to Tavares that he was "harder on

blacks because he did not want it shown that he was showing any bias towards

blacks."  Evergin Aff. ¶¶ 27–29, ECF No. 143.  Again, Plaintiff offers Evergin's

statement regarding Tavares' alleged statement about Brown's alleged statement to

prove the truth of the matter asserted, that is, that Brown treated African-American

officers differently.  Brown attested that he did not make the alleged statement.  Brown

Aff. ¶¶ 3–4, attached to Def.'s Reply, ECF No. 162–2.  Like Moore's statement,

Evergin's statement regarding Tavares' statement to Evergin about what Brown told

Tavares is double hearsay, and likewise, may not properly be considered by the Court

on summary judgment.[6]  *See Jacklyn*, 176 F.3d at 927; *Gibson*, 409 F.3d at 337.

Accordingly, Plaintiff fails to present admissible direct evidence that she was

discriminated against on the basis of race, and the Court proceeds to evaluate her

claim under the indirect method.

### 2.  Indirect evidence

Plaintiff's circumstantial evidence of race discrimination is analyzed under the

burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S.

---

[6]The Court notes that the plaintiffs in the related case *Eddie Arnold, et al. v. City of Columbus*, No. 2:08–cv–262, offer a statement from the declaration of Plaintiff Melvin Hoston as evidence for that same alleged statement by Brown.  In his declaration, Hoston simply attests that: "Safety Director Mitchell Brown made the statement that he is harder on blacks than whites, just to seem fair."  Hoston Decl. ¶ 12, ECF No. 138.  As a statement made by someone other than the declarant, offered to prove the truth of the matter asserted, that Brown treated African-Americans differently, that evidence would also be inadmissible hearsay.  Moreover, plaintiffs do not argue either that Hoston's statement is not hearsay or that a hearsay exception applies to his statement.  Additionally, plaintiffs in *Eddie Arnold, et al. v. City of Columbus*, No. 2:08–cv–262, offer a statement from the deposition of Wesley Fullen, the plaintiff in a third related case, *Fullen v. City of Columbus*, No. 2:08–cv–263, as evidence of that same alleged statement by Brown.  For the same reasons that apply to Evergin's statement, and for the reasons stated in the Opinion and Order in Case No. 2:08–cv–262, Fullen's statement is also double hearsay.

792, 802–05 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256–59 (1981). *See, e.g., Upshaw*, 576 F.3d at 584. Under this framework, a plaintiff bears the initial burden of establishing a prima facie case of racial discrimination. *See Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). Although "[t]here are many 'context-dependent ways by which plaintiffs may establish a prima facie case,'" "'[t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007) (quoting *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).

To establish a prima facie case, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) a similarly-situated person outside the protected class was treated more favorably than she was. *See Braithwaite*, 258 F.3d at 493. If the plaintiff demonstrates a prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. *Id.* Once the defendant articulates a legitimate nondiscriminatory reason for its action, the burden shifts back to the plaintiff to establish that the defendant's proffered reason was a pretext for discrimination. *Id.* "To show pretext, a plaintiff must be able to demonstrate *both* that the 'reason was false, and that discrimination was the real reason.'" *Pittman v. Cuyahoga Valley Career Ctr.*, 451 F. Supp. 2d 905, 917 (N.D. Ohio 2006) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

"[A]lthough the McDonnell Douglas presumption shifts the burden of production to the defendant, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Ctr.*, 509 U.S. at 518 (quoting *Burdine*, 450 U.S. at 253).

Here, Defendant argues that Plaintiff's Title VII race discrimination claim must fail because she cannot establish the second and fourth elements of the prima facie case, namely, that she suffered an adverse employment action and/or was treated differently than a similarly-situated co-worker outside her protected class, and cannot show that the legitimate, non-discriminatory reasons it offers for its actions are pretextual.

Defendant first argues that Plaintiff cannot establish a prima facie case of race discrimination based on the PSU, CDP, and Krivda investigations. Defendant argues that the investigations were not adverse employment actions and that Plaintiff cannot show that she was treated differently than a similarly-situated co-worker outside her protected class. Defendant also argues that even if Plaintiff could establish a prima facie case with respect to the investigations, they were conducted for a legitimate, non-discriminatory reason. Additionally, Defendant argues that Plaintiff's Title VII claim with respect to the CDP and PSU investigations is time-barred because Plaintiff did not file her EEOC charge regarding those investigations within 300 days from when they concluded.

Second, Defendant argues that Plaintiff cannot establish a prima facie case of race discrimination based on the forty-hour suspension she received. Defendant does not argue that this suspension was not an adverse action, but argues that Plaintiff

cannot show she was treated differently than a similarly-situated co-worker outside her protected class. Defendant also argues that it had a legitimate, non-discriminatory reason for imposing this discipline.

Third, Defendant argues that Plaintiff cannot establish a prima facie case of race discrimination based upon the other miscellaneous allegations of her Second Amended Complaint. Specifically, Defendant argues that Plaintiff cannot establish a claim of race discrimination based on additional investigations she alleges she was subjected to, multiple personnel warning letters she allegedly received, or her transfer from the FPB to Emergency Services. Defendant also argues that Plaintiff cannot establish a prima facie case of race discrimination based on the fact that Union representative James Davis was present at her interview with Krivda despite Plaintiff's objections, or the fact that her interview with Krivda was tape recorded.

In response, Plaintiff argues that she can establish a prima facie case of racial discrimination. First, she identifies three specific employment actions that she was allegedly subjected to, and which she claims constitute adverse actions. Specifically, Plaintiff argues that she suffered an adverse action in: (1) being transferred from the FPB to Emergency Services; (2) never receiving pay for "having to act up . . . as Head of the FPB" due to the absences of Paxton and Ellis; and (3) receiving a forty-hour disciplinary suspension. Pl.'s Mem. Opp'n Page ID #5024. From there, however, Plaintiff's argument is considerably more opaque. She appears to assert that she suffered an additional adverse action because she, as she phrases it, was "singled out and falsely accused quite publicly of criminal behavior," subjected to "investigations based on clear falsehoods and bare allegations, picked up by the press," and

subjected to "increased (unwarranted) scrutiny." *Id*. at Page ID #5024. Although Plaintiff does not say so directly, the Court deduces from that language that Plaintiff is also alleging that the PSU, CDP and Krivda investigations constituted adverse actions.

In addition to arguing that she did suffer actions which qualify as adverse, Plaintiff argues that she satisfies the remainder of the prima facie case because she was treated differently than similarly-situated co-workers outside her protected class. Finally, Plaintiff argues that Defendant's stated reasons for its actions are pretextual.

### a. Plaintiff's Title VII claim of race discrimination is time-barred with respect to the PSU and CDP investigations

As a preliminary matter, the Court agrees with Defendant that Plaintiff's Title VII race discrimination claim with respect to the PSU and CDP investigations is time-barred. In order to bring a Title VII lawsuit, a plaintiff must first file a timely discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). *See Amini v. Oberlin College*, 259 F.3d 493, 498 (6th Cir. 2001). In Ohio, a "deferral state," a plaintiff must file an EEOC Charge within 300 days of the alleged discriminatory act. *See id*. at 498 (quoting *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 407 (6th Cir. 1999)).

Defendant argues that Plaintiff failed to exhaust her administrative remedies with respect to the CDP and PSU investigations because Plaintiff did not file her EEOC charge regarding those investigations within 300 days of when they concluded. Defendant presents evidence, and Plaintiff does not dispute, that the PSU investigation was completed in February 2005, with its findings issued in May 2005, and that the CDP investigation was completed in March 2005. Brown Aff. ¶¶ 3–4, ECF

No. 81–3. Defendant also presents evidence that Plaintiff filed an EEOC Charge (cross-filed with the Ohio Civil Rights Commission ("OCRC")) on August 10, 2006, in which she alleged claims of discrimination on the basis of race and sex, retaliation, and hostile work environment, based in part on being "subjected to numerous investigation [sic]" and "subjected to bias [sic] PSU investigation." Pamela Gordon Aff. ¶ 5 and exhibit thereto, ECF No. 81–5.

In her response, Plaintiff confirms that she filed an OCRC Charge on August 10, 2006 regarding "the investigations into the FPB Inspectors and allegations of misconduct." Pl.'s Mem. Opp'n Page ID #5020. Plaintiff, however, does not in any way address or dispute Defendant's argument that her Title VII claims based on the CDP and PSU investigations are time-barred. Plaintiff does not argue, for example, that she filed a separate, earlier EEOC or OCRC charge regarding the investigations within the 300-day limitations period. Plaintiff also does not argue that the 300-day limitations period should be calculated from a date other than the date the investigations concluded, or should equitably tolled for any reason. Rather, Plaintiff argues only that because Ohio Revised Code § 4112.02 does not require an EEOC or OCRC charge to perfect a claim and that a six-year statute of limitations applies to claims brought under that Section, her discrimination and retaliation claims based on the CDP and PSU investigations are timely under Ohio law. Thus, Plaintiff has waived the argument that her Title VII race discrimination claim based on the PSU and CDP investigations is properly before the Court.

Accordingly, the Court finds that Plaintiff's Title VII claims of race discrimination based on the PSU and CDP investigations are time-barred due to Plaintiff's failure to

timely file an EEOC charge regarding those investigations. The Court notes, however, that it will consider these two investigations in evaluating Plaintiff's hostile work environment claims. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) ("Provided that an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability."). Additionally, Plaintiff is correct that her discrimination and retaliation claims based on the PSU and CDP investigations are timely under Ohio law. *See Harrison v. City of Akron*, 43 F. App'x 903, 905 (6th Cir. 2002) (a plaintiff need not exhaust administrative remedies prior to filing suit for race discrimination under Ohio Revised Code § 4112); *Cosgrove v. Williamsburg of Cincinnati Mgt. Co.*, 70 Ohio St. 3d 281, 282 (1994) (the statute of limitations for bringing a claim under § 4112.02 is six years). For the purposes of her § 4112.02 claim, the Court will discuss her substantive claim that the PSU and CDP investigations constitute an adverse action in Section III(A)(e), below.

The Court now turns to whether Plaintiff has established a prima facie case of racial discrimination with regard to her other allegations.

### b. Transfer from FPB to Emergency Services

Plaintiff asserts that she suffered an adverse employment action when she was transferred from the FPB to the Emergency Services Bureau in September 2006. Pl.'s Mem. Opp'n Page ID #5024. Plaintiff characterizes the move as a demotion, alleging that she was "stripped of her duties," and that in her new position, she "no longer oversees inspectors or is in command of anyone, despite being a BC." *Id*. Defendant argues that Plaintiff's move was a lateral transfer, and therefore not an adverse

employment action. Def.'s Reply Page ID #5418, ECF No. 162.

An adverse employment action in the context of a Title VII discrimination claim is a "materially adverse change in the terms or conditions of employment because of the employer's actions." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (quoting *Allen v. Mich. Dept. of Corr.*, 165 F.3d 405, 410 (6th Cir.1999)). A materially adverse change includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002)). Notably, "a change in employment conditions 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Thus, reassignments or lateral transfers without accompanying changes in salary, benefits, title, work hours or material responsibilities usually do not constitute adverse employment actions. *See id.* at 885; *Momah v. Dominguez*, 239 F. App'x 114, 123 (6th Cir. 2007).

As noted, at the summary judgment stage, the Court "must look to the evidence and facts, not to labels and allegations," and Plaintiff "must come forward with probative evidence tending to support" her allegations. *Steward v. New Chrysler*, No. 08-1282, 2011 WL 338457, at *7 (6th Cir. Feb. 4, 2011) (citing *Anderson*, 477 U.S. at 256). Here, Plaintiff presents no evidence to establish her position change was more than a *de minimus* employment action. She concedes that she retained the title of Battalion Chief after her reassignment, and cites no evidence, and does not argue, that

her salary, benefits or work hours have changed. Additionally, although Plaintiff alleges that she was "stripped of her duties" and "no longer oversees inspectors or is in command of anyone, despite being a BC," she cites no evidence that her material responsibilities in her new position are significantly diminished such that the transfer could be considered an adverse action. The only evidence Plaintiff offers regarding her transfer elsewhere in her response is that she has "attempted on numerous occasions to be reinstated to her position [in the FPB], but has been denied each time." Pl.'s Mem. Opp'n Page ID #5019. Specifically, Plaintiff offers testimony from her deposition stating that she "applied to be reinstated to the [FPB]" seven times, but "[has] never gotten a response." *Id.*; Y. Arnold Dep. 222–23, ECF No. 81–7. Such evidence may demonstrate that Plaintiff desires to be in the FPB, rather than in Emergency Services, and that her reassignment was involuntary. However, it demonstrates *only* that her reassignment was involuntary.

To establish that she suffered an adverse action, Plaintiff must cite evidence that her reassignment, even if involuntary, was to a less prestigious position or a position with significantly diminished material responsibilities, resulted in a change to her salary, benefits or work hours, or otherwise amounted to a demotion based on "other indices . . . unique to [the] particular situation." *Kocsis*, 97 F.3d at 885–87; *see also White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004) (reassignment that resulted in no loss of salary or benefits was a demotion because new position was "more arduous and 'dirtier,'" and previous position "required more qualifications, which is an indication of prestige," and "was objectively considered a better job and the male employees resented [plaintiff] for occupying it"); *Keeton v.*

*Flying J, Inc.*, 429 F.3d 259, 264–65 (6th Cir. 2005) (jury could have reasonably found, under the facts of the particular case, that plaintiff's transfer to a position involving the same responsibilities and pay constituted an adverse employment action where the transfer "increased [the plaintiff's] commute to the extent he needed to consider relocation"); *Strouss v. Mich. Dept. of Corr.*, 250 F.3d 336, 343 (6th Cir. 2001) (in Title VII retaliation context, nurse's lateral transfer to another facility where she may have been put into contact with prisoners who had issued threats against her constituted an adverse action); *Mosholder v. Barnhardt*, No. 09-CV-11829-DT, 2010 WL 5559406, at *7 (E.D. Mich. Feb. 12, 2010) (implying that involuntary transfer was in itself not an adverse action, but could be considered an adverse action where it also resulted in a loss of guaranteed holidays and weekends off, a change in job responsibilities, and a move to a more dangerous position).

Plaintiff cites no evidence that her position in the Emergency Services Bureau is less prestigious, involves diminished responsibilities or reduced pay or benefits, or is in any way less desirable than her former position in the FPB.  The Court has no duty to comb the record in search of such evidence.  *See Nerswick*, 692 F. Supp. 2d at 882. Thus, Plaintiff fails to establish that her transfer from FPB to the Emergency Services in September 2006 was an adverse action.  Furthermore, even if Plaintiff had established that the transfer was an adverse action, she does not argue, and offers no evidence to show, that she was treated differently than similarly-situated officers outside her protected class with regard to the transfer.  That issue is therefore waived. *See United States v. Sandridge*, 385 F.3d 1032, 1035–36 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived."). Defendant is therefore entitled to summary judgment on Plaintiff's claim of race discrimination based on her transfer from the FPB to the Emergency Services Bureau.

### c. Not being paid to "act up"

Plaintiff alleges that she suffered an adverse employment action in never being paid "for having to act up (in a temporary higher-ranking assignment) as Head of the FPB because of the <u>unrecorded</u> and constant AWOLS of both Paxton and Ellis—against City policy, despite her complaints about it." Pl.'s Mem. Opp'n Page ID # 5024. Elsewhere in her memorandum, Plaintiff presents evidence that "Paxton's absences from the office [were] so frequent that it was difficult to get issues resolved," and that "[t]hough both Chief Paxton and Chief Ellis . . . were away from the office a great deal [she] was not compensated for doing the duties of the bureau head in their absence." Y. Arnold Decl. ¶¶ 38–39, ECF No. 134. Plaintiff also presents evidence that she complained to Chief Pettus that Paxton "would be out of the office for days at a time, week after week, month after month without having his time charged to vacation, professional time, comp-time, sick-leave, etc." Mem. from Y. Arnold to N. Pettus dated May 4, 2005, ECF No. 126–18. Plaintiff, however, does not at any point present a cogent argument as to how or why the fact that she was not compensated for performing the duties of the Bureau Head constitutes an adverse employment action. Indeed, Plaintiff's *only* argument in that regard appears to consist of her citation to *Jordan v. City of Cleveland*, 464 F.3d 584 (6th Cir. 2006), for the proposition that a firefighter's loss of "acting time" constitutes a tangible employment action. Pl.'s Mem. Opp'n Page ID # 5025. *Jordan*, however, is distinguishable, in that it involved an

official policy of the Cleveland Division of Fire to compensate firefighters as officers when they acted in that capacity, and the denial on three specific occasions of such "acting time" to the plaintiff firefighter. Here, in contrast, Plaintiff does not allege or identify any policy of the Columbus Division of Fire that would entitle her as Battalion Chief to "acting time" for performing the duties of her superiors in their absence. Plaintiff, in other words, fails to establish that she was even entitled to be compensated for "acting time" in the first place. With no basis to conclude that Plaintiff was entitled to acting time, the Court cannot determine that Plaintiff was wrongfully denied compensation for having to "act up," much less that this constituted an adverse employment action. Defendant is therefore entitled to summary judgment on Plaintiff's claim of race discrimination based on the alleged denial of acting time.

### d. Forty-hour disciplinary suspension

Defendant concedes that the forty-hour suspension Plaintiff received for "lack of diligence" resulting from her allegations that Lt. Daum removed documents from the FPB constituted an adverse employment action. Defendant, however, argues that Plaintiff cannot establish a prima facie case of race discrimination based on that suspension because she cannot establish that a similarly-situated person outside of her protected class was treated more favorably. Additionally, Defendant argues that even if Plaintiff could establish that she was treated differently than a similarly-situated employee, it had a legitimate, non-discriminatory reason for imposing the suspension. In response, Plaintiff argues that because her position as Battalion Chief was "unique," she need not meet the burden of establishing the similarly-situated requirement. Pl.'s Mem. Opp'n Page ID #5023. She also argues, essentially, that all officers within the

CDF are her comparators because in the CDF, "as in a paramilitary organization, the rules should and must apply to everyone equally." *Id*. She argues that "[Union President Jack] Reall, Paxton, and Ellis (among many other whites) were all permitted to abuse the system and, though the City was informed of their misdeeds, were never investigated nor were the rules ever enforced against them." *Id*.

It is Plaintiff's burden to produce affirmative evidence to establish that she was treated differently than a similarly-situated person outside her protected class. *See, e.g., Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). To satisfy the similarly-situated requirement, a plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment;" rather, the plaintiff must demonstrate that she is similarly situated to the purported comparator in "all of the *relevant* aspects." *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). To be "similarly situated" in the disciplinary context, the plaintiff and her proposed comparator must have engaged in acts of *"comparable seriousness."* *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (emphasis in original) (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)). Factors to be considered include whether the individuals with whom a plaintiff seeks to compare her treatment dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. The Sixth Circuit has cautioned, however, that each *Mitchell* factor does not apply in every case and that the similarly-

situated standard should not be applied narrowly. *See Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396–97 (6th Cir. 2008). Otherwise, where a plaintiff holds a unique position, an overly narrow definition of similarly-situated would "effectively remove[] [a plaintiff] from the protective reach of the antidiscrimination laws." *Jackson*, 518 F.3d at 397.

Plaintiff asserts, and Defendant does not dispute, that Plaintiff's position as the lone Battalion Chief in the FPB was unique. Although Plaintiff cites no evidence whatsoever to support the alleged "uniqueness" of her position, the Court is mindful of the Sixth Circuit's admonition against construing the similarly-situated standard too narrowly. Moreover, as Defendant does not submit evidence to the contrary, the Court is concerned that limiting Plaintiff's comparators to only those officers at the rank of Battalion Chief would be the type of overly narrow application against which *Jackson* cautioned. Of course, the fact that she held a unique position does not completely alleviate Plaintiff's burden to establish the similarly-situated element. Plaintiff still must establish that she was treated differently from an employee outside her protected class who is similar in all relevant aspects. *See Ercegovich*, 154 F.3d at 352.

As discussed above, Plaintiff was disciplined for making allegedly false accusations against Lt. Daum. At various points throughout her memorandum in opposition, Plaintiff does allege, and in some cases presents some evidence, that another officer engaged in misconduct or made a false accusation against her but was not disciplined. Specifically, Plaintiff alleges that:

- **AC Paxton** allegedly falsely accused the FPB inspectors of missing inspections, prompting the PSU and CDP investigations. Pl.'s Mem. Opp'n Page ID #5017, 5026–27.

- Union President **Jack Reall** allegedly made false accusations about Plaintiff in a letter to Krivda, before Krivda began her investigation. *Id.* at Page ID #5031; Letter from J. Reall to P. Krivda dated June 23, 2005, ECF No. 122–38.

- Defendant allegedly excused and did not fully investigate an incident where an anonymous complaint was made against **AC Ellis** of "conduct unbecoming an assistant chief." Pl.'s Mem. Opp'n Page ID #5029.

- **BC Charles Campbell**, the head of the PSU investigation unit, allegedly made false statements about Plaintiff to Krivda in the course of Krivda's investigation. *Id.* at Page ID #5033 n.16.

- **Captain James Davis** falsely alleged that Plaintiff and then-Captain Fullen were creating overtime for the FPB inspectors to pad their wages. *Id.* at Page ID #5016; Y. Arnold Dep. 34–36, ECF No. 81–7.

- Plaintiff was falsely accused of cheating on a promotional exam by **DC Butcher**. Consequently, she was not allowed to prepare for a portion of the exam, failed, and did not receive the promotion. No action was taken against Butcher. Pl.'s Mem. Opp'n Page ID #5016; Y. Arnold Decl. ¶ 213, ECF No. 134.

- Although Plaintiff was disciplined for "'fail[ing] to document' seeing a person destroying and removing documents central to this case," "no one else ever was even investigated for similar failure to document anything," and City failed "even to learn or inquire into who in the Fire Department had destroyed thousands of documents relating to this case." Pl.'s Mem. Opp'n Page ID #5025 n.8.

Plaintiff, however, fails to prove that she was similarly situated to any of the officers identified above. As an initial matter, the Court notes that the section of Plaintiff's memorandum in opposition arguing that she has satisfied the similarly-situated requirement (Section IV(B)(2)) is sorely lacking in both law and evidence. In that section, Plaintiff merely alleges vaguely that "Capt. Reall, Paxton, and Ellis (among many other whites) were all permitted to abuse the system" but were never disciplined. She does not even mention Davis, Butcher and Campbell—if they are the "other whites" to whom she refers—by name. She does not describe the way in which her employment situation was similar to that of any those officers, aside from alleging

that they were all members of a "paramilitary"-type organization, or the way in which their conduct was of "comparable seriousness." She argues that the "rules should and must apply to everyone equally," but cites no evidence to establish, for instance, that all CDF officers were subject to the same standards. Nor does she cite any legal authority to support the implication she urges—that because the "rules should and must apply [] equally" to all CDF officers, all officers should automatically be considered to be similarly situated to her.

Moreover, in that section, Plaintiff offers no evidence from the record to support her claim. Aside from one general reference to her declaration, she does not cite *one* distinct piece of evidence—not a single document, or a statement from a deposition, or even a specific paragraph from her declaration—to establish that she has met the similarly-situated requirement.

In addition, looking more broadly at the entirety of Plaintiff's memorandum in opposition, the Court notes that Plaintiff at no point articulates, or provides evidence to demonstrate, how her employment situation was similar to that of Reall, Paxton or Ellis, or to any other Caucasian CDF officer, or how their alleged conduct was comparable to that for which she was disciplined. Furthermore, apart from her allegation regarding DC Butcher, Plaintiff cites no evidence to demonstrate that these officers were not, in fact, disciplined in some way. The Court has no duty to comb the record for evidence that any of the individuals Plaintiff mentions were in fact similarly situated to her and engaged in acts of comparable seriousness. *See Nerswick*, 692 F. Supp. 2d at 882. Rather, it is Plaintiff's duty to direct the court to those specific portions of the record which support her claim, and Plaintiff's burden to establish that a

similarly-situated person outside her protected class was treated more favorably than she. *See In re Morris*, 260 F.3d at 665. Plaintiff's generalized allegations, unsupported by evidence, are insufficient to meet that burden. *See Sandridge*, 385 F.3d at 1035–36.

Accordingly, Plaintiff fails to establish the similarly-situated element of the prima facie case with respect to her disciplinary suspension. Even if she had established a prima facie case, however, Defendant offers a legitimate, non-discriminatory reason for Plaintiff's discipline: Plaintiff was disciplined for dishonesty because although she stated during a PSU investigation that Rhonda Sipe and James Sawyers had witnessed Lt. Daum removing documents, Sipe and Sawyers denied seeing Lt. Daum doing so. Plaintiff does not present admissible evidence that such reason was false and that racial discrimination was the real reason she was suspended. *See Pittman*, 451 F. Supp. 2d at 917. Defendant thus is entitled to summary judgment on Plaintiff's claim of race discrimination with respect to her forty-hour suspension.

### e. The PSU, CDP and Krivda investigations

Plaintiff argues that she was subject to an adverse action in being subjected to "investigations based on clear falsehoods and bare allegations, picked up by the press," being "singled out and falsely accused quite publicly of criminal behavior," and in being subjected to "increased (unwarranted) scrutiny." Pl.'s Mem. Opp'n Page ID #5024–25. In addition to those allegations, elsewhere in her memorandum in opposition Plaintiff alleges that she "was more the target [of the investigation] than anything else," and was "repeatedly interviewed by Krivda—a total of eight times in all." *Id.* at Page ID # 5017. Plaintiff also alleges that Krivda's report of her investigation is

"based on false and conclusory racist allegations by Columbus officials and ranking personnel." *Id*. at Page ID #5019. It appears to that Court that with that language, Plaintiff is attempting to argue that the PSU, CDP and Krivda investigations constituted adverse employment actions.

In advancing that argument, Plaintiff seems to suggest that the fact she was scrutinized during the investigations, allegedly more so than other officers, constitutes an adverse action. The cases Plaintiff cites in support of the argument that "increased (unwarranted) scrutiny alone was itself adverse," however, are inapposite. Those cases address the requirements of the prima facie case in the Title VII *retaliation* context, which notably applies a less demanding standard for determining whether an employment action is adverse, and involve entirely different factual scenarios. For instance, Plaintiff cites to *Speers v. Univ. of Akron*, 189 F. Supp. 2d 759 (N.D. Ohio 2002). In that case, the court determined that a plaintiff had established the adverse action prong of her prima facie case of Title VII retaliation not because she was subjected to a certain degree of scrutiny during an investigation, but because she presented evidence that "she received unwarranted disciplinary action, a reduction in compensation, and assignment to less favorable teaching assignments because of her protected activity." *Id*. at 767. In addition, Plaintiff relies on *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428 (6th Cir. 2009) for the proposition that "the fact that the scrutiny *increased* is critical." Pl.'s Mem. Opp'n Page ID #5025–26. The court in *Hamilton,* however, made this observation to help explain its conclusion that because a plaintiff had shown temporal proximity between the filing of his EEOC complaint and his termination, and had asserted that his employer increased its scrutiny of his work after

he filed his EEOC complaint, he had established the *causation element* of the prima

facie case of retaliatory termination. *Hamilton*, 556 F.3d at 436. Plaintiff, in short, cites

no legal authority to support the proposition that repeated interviews or scrutiny during

the pendency of an investigation is tantamount to an adverse employment action in the

context of a race discrimination claim.

Notably, even an investigation that results in a suspension with pay and full

benefits is not an adverse employment action. *See White*, 364 F.3d at 803; *see also*

*Virostek v. Liberty Township Police Dept./Trustees*, 14 F. App'x 493, 505 (6th Cir.

2001) (concluding, in the retaliation context, that an investigation alone was not

sufficient to establish an adverse employment action where plaintiff never served the

recommended one-day suspension and testified that she had not suffered any loss as

a result of the investigation). Plaintiff does not allege, much less present evidence,

that she was suspended without pay during the pendency of any of the investigations,

or that they resulted in a demotion, discipline, or any other materially adverse change

in the terms or conditions of her employment. To the contrary, Plaintiff has always

maintained that the investigations concluded that there was no wrongdoing on the part

of Plaintiff or the FPB investigators. *See* Second Am. Compl. ¶¶ 31, 32, 42, ECF No.

71; Pl.'s Mem. Opp'n at Page ID #5012, 5030. Plaintiff would thus urge the Court to

find that the degree of "scrutiny" of an investigation may qualify as an adverse

employment action, even though an investigation that results in a suspension typically

does not. Such a conclusion strikes the Court as illogical, and Plaintiff provides no

legal authority in support of her argument to convince it otherwise.

In addition to complaining of increased scrutiny, Plaintiff states that she was

"singled out and falsely accused quite publicly of criminal behavior." With that language, it seems to the Court that Plaintiff attempts to argue that the investigations constituted adverse actions because of the negative media coverage they received. While it is conceivable that Plaintiff may have felt humiliated or, as she states, suffered a "loss of dignity" as a result of the media coverage, she neither presents evidence nor cogently argues that being "accused quite publicly of criminal behavior" or suffering a "loss of dignity" effected a "materially adverse change in the terms or conditions of [her] employment." *Michael*, 496 F.3d at 593. Plaintiff thus has not established that the media coverage of the investigations constituted an adverse action.

As another matter, the Court notes that to the extent Plaintiff bases her claim of racial discrimination on the procedures or process of the Krivda investigation, she cites no legal authority that Defendant may even be held responsible for the alleged conduct of an independent, third-party investigator.

Lastly, Plaintiff's race discrimination claim based on the investigations also must fail because she does not demonstrate that Defendant's legitimate, non-discriminatory reason for initiating the investigations is pretextual. Defendant asserts that it had a duty to investigate the allegations of wrongdoing within the FPB, and that the Krivda investigation was also necessary to address the allegations of racial discrimination *Plaintiff herself raised* in her May 4, 2005 memorandum to Chief Pettus. *See* Pettus Aff. ¶¶ 4, 7, ECF No. 81–4; Brown Aff. ¶¶ 5–6, ECF No. 81–3; Def.'s Mot. Summ. J. Page ID # 664, ECF No. 81; Def.'s Reply Page ID # 5415, ECF No. 162.[7]  Plaintiff

---

[7]Plaintiff repeatedly refers the Court to the briefs and arguments presented by the plaintiffs in the related cases. *See, e.g.*, Pl.'s Mem. Opp'n Page ID #5041. In looking to these arguments, the Court notes that plaintiffs in related Case No. 2:08–cv–264, *Maxwell, et al. v. City of Columbus*, concede, and

provides no admissible evidence of pretext; that is, no admissible evidence that "a discriminatory reason more likely motivated [Defendant]," or that Defendant's "proffered explanation is unworthy of credence." *Wright*, 455 F.3d at 707. Indeed, Plaintiff's unsupported argument that the Krivda investigation, in particular, was pretext for intentional discrimination, is difficult even to conceive. In the first place, that investigation was promptly launched in direct response to the allegations of discrimination Plaintiff herself raised. Once Plaintiff made allegations of discrimination, Defendant was essentially legally required to conduct an investigation. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) (recognizing that in line with the "primary objective" of Title VII "not to provide redress but to avoid harm," employers have an "affirmative obligation to prevent violations" of Title VII). Moreover, in the utter absence of evidence demonstrating pretext, it appears to the Court that Defendant's "unprecedented" decision to hire an independent party to conduct the investigation speaks to the extent to which Defendant took Plaintiff's allegations seriously. Since Plaintiff's complaints about discrimination and hostile environment within the CDF sparked the Krivda investigation, Defendant appears to have acted responsibly in assigning the investigation to someone entirely removed from that environment.

Thus, for all of the aforementioned reasons, Defendant is entitled to summary judgment on Plaintiff's race discrimination claim based on the PSU, CDP and Krivda investigations.

---

even argue, that Krivda's investigation was meant, in part, "to investigate the complaints of discrimination that the Plaintiff inspectors and Plaintiff BC Arnold had begun to raise." Pls.' Mem. Opp'n Page ID #4698, Case No. 2:08–cv–264, ECF No. 107; *see also id*. at Page ID # 4703–04 & n.6.

### f. Other allegations

Plaintiff does not present a cogent response to Defendant's argument that she cannot establish a prima facie case of race discrimination based on additional allegations she had initially asserted in her Complaint. Specifically, Plaintiff does not present a cogent argument that she suffered an adverse employment action with respect to: (1) seventeen/fourteen investigations or write-ups she alleges she was subjected to during her tenure at the FPB; (2) multiple personnel warning letters she allegedly received; (3) the fact that Union representative James Davis was present at Krivda's interviews with Plaintiff and the FPB inspectors, despite their objections; or (4) the fact that Krivda tape recorded her interviews with Plaintiff and the African-American FPB inspectors, but did not tape record her interviews with Caucasian officers. Plaintiff merely mentions these actions in her memorandum in opposition, and presents no argument they are materially adverse. She also presents no evidence that Krivda only tape recorded her interviews with Caucasian officers, and not even a cogent argument that she was treated differently than a similarly-situated officer in receiving fourteen or seventeen investigations or write-ups and multiple warning letters (which, she concedes, did not constitute or result in discipline). To the extent Plaintiff initially sought to assert a claim of race discrimination based on these events, she has waived such claims by failing to support or develop that argument. *See Sandridge*, 385 F.3d at 1035–36 ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").[8]

---

[8]The Court notes that in her Second Amended Complaint, Plaintiff asserts that she was accused of cheating in 2005. Second Am. Compl. ¶¶ 56–59, ECF No. 71. Similarly, in the "Statement of Facts" section of her memorandum in opposition, Plaintiff asserts that at some point around 2003, she was

## B. Racially Hostile Work Environment

Plaintiff alleges that she was subject to a racially hostile working environment in violation of Title VII and Ohio Revised Code § 4112.02. To establish a prima facie case of hostile work environment based on race, Plaintiff must establish that: (1) she is a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *See Russell v. Univ. of Toledo*, 537 F.3d 596, 608 (6th Cir. 2008). A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal quotations and citations omitted). The Court must examine the totality of the circumstances to determine whether the work environment was hostile. *Harris*, 510

---

forbidden to study for a promotional exam due to accusations that she had cheated, and consequently did not receive a promotion to Deputy Chief. Pl.'s Mem. Opp'n Page ID #5016; Y. Arnold Decl. ¶ 213, ECF No. 134. Plaintiff does not assert that she suffered an adverse action in not receiving the promotion, however, and fails to cite evidence that she was qualified for the promotion or that other similarly qualified employees outside her protected class were treated differently with respect to promotion. Thus, to the extent Plaintiff attempted to assert a claim of race discrimination based on the allegedly false accusations that she cheated on an promotional exam or based on not receiving the promotion, because she raises the issue in a wholly cursory fashion and without any evidentiary support or development of argument, she has waived such a claim. *See Sandridge*, 385 F.3d at 1035--36.

    Additionally, the Court notes that in her Second Amended Complaint, Plaintiff initially asserted that she received a memorandum of counseling in 2006 "for allegedly violating the policies of [the CDF] in allowing inspectors to receive [four] hours of overtime for inspections made at the beginning of the shift." Second Am. Compl. ¶¶ 52–55, ECF No. 71. She also asserted that Defendant initiated an investigation and disciplinary action regarding alleged wrongdoing involving her EMT-B card. *Id*. at ¶¶ 72–83. Because she does not even raise these issues in her memorandum in opposition, the Court deems them waived as well. *See Sandridge*, 385 F.3d at 1035–36.

U.S. at 23. In doing so, the Court considers factors such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *see also Barrett*, 556 F.3d at 515 (reciting factors from *Harris*).

In establishing an adverse effect on work performance, a plaintiff need not prove that her tangible productivity has declined due to the harassment, but need only show that the harassment made it more difficult to do her job. *See Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988). Both an objective and a subjective test must be applied: the conduct must have been severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as having been abusive. *Harris*, 510 U.S. at 21–22. Title VII is not a "general civility code," and thus "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation omitted). Rather, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788; *see also Barrett*, 556 F.3d at 515 (quoting *Faragher*).

Claims for hostile work environment brought under Ohio Revised Code § 4112.02 are evaluated using the same evidentiary standards and analysis used for federal claims under Title VII. *See Satterfield v. Karnes*, 736 F. Supp. 2d 1138, 1157 (S.D. Ohio 2010).

As an initial matter, the Court notes that in the section of Plaintiff's

memorandum in opposition headed: "Samples of evidence in the record of the hostile environment endured by [Plaintiff and the plaintiffs in the related cases]" (Section IV(E)(3)), Plaintiff sets forth only seven specific such examples, all of which are articles from *The Columbus Dispatch,* written by a *Dispatch* reporter. Pl.'s Mem. Opp'n Page ID #5042–43. In that section, Plaintiff cites no other specific evidence from the record which she contends demonstrates a hostile work environment. It thus appears that Plaintiff's argument that she was subjected to a hostile work environment is premised mainly on her contention that she was "falsely branded for nearly two years as [a criminal] in the media." *Id.* at Page ID #5043.

Plaintiff also attempts to link the content of the negative *Dispatch* articles with the City or the CDF—she argues not just that the articles themselves constituted harassment, but also speculates that the City was responsible for the allegedly harassing and false content of the articles. According to Plaintiff, someone in the CDF leaked "false and misleading" information to the *Dispatch*. *Id.* at Page ID #5043. Then, as she puts it, "the *Dispatch* and reporter Jodi Andes (who clearly was getting insider information) took the bit in her teeth and ran like a horse on fire with the false accusations, in *Dispatch* articles permeating a near two-year period." *Id.* at Page ID #5042. Plaintiff speculates that "fire and top City officials were participating in the falsehoods and harassing stories, with numerous (and incorrect) quotations in various Dispatch stories by high-ranking officials." *Id.* at Page ID #5043. Elsewhere in her memorandum, Plaintiff alleges that Paxton, in particular, "fanned" and "fostered" the "many comments[] and negative publicity about the inspectors," and that the "City clearly ratified the false light and negatively publicity." *Id.* at Page ID #5044–45. As

mentioned, Plaintiff provides seven specific examples of these allegedly false and harassing *Dispatch* articles. *Id*. at Page ID #5042.

Plaintiff, however, offers no evidence besides her own speculation that the CDF was deliberately providing false information to the *Dispatch*. In the absence of such evidence, Plaintiff would have the Court determine that the views expressed in articles published by an independent newspaper, written by that newspaper's reporter, can violate Title VII. The Court is extremely skeptical of such a claim, given its possible First Amendment implications. Moreover, even if she did offer evidence that CDF officers were providing the *Dispatch* false information about her, Plaintiff offers no legal authority for the proposition that such actions can form the basis of a hostile work environment claim. Furthermore, even if Plaintiff had proved that certain CDF officers leaked false information about her to the *Dispatch*, and even if she had presented legal authority that such actions could properly be considered as part of a hostile work environment claim, Plaintiff presents no evidence that the articles unreasonably interfered with her work performance, or made it more difficult to do her job, as required to establish the prima facie case. *See Harris*, 510 U.S. at 23; *Davis*, 858 F.2d at 349.

As noted, in the section of her memorandum in opposition directing the Court to "samples of evidence in the record of the hostile environment," the seven *Dispatch* articles are the *only* specific pieces of evidence Plaintiff cites as demonstrating a hostile work environment.[9] Nonetheless, the Court considers whether Plaintiff can

---

[9]In this section, Plaintiff asserts that the record in this case and the three related cases contains "hundreds of acts that comprise actionable claims of hostile environment." Pl.'s Mem. Opp'n Page ID #5044. The Court is mindful that pursuant to Federal Rule of Civil Procedure 56, it may consider other materials in the record that the parties have not cited, but "need consider only the cited materials." Fed.

establish a claim of racially hostile work environment based on the other events of which she complains. To reiterate, Plaintiff states that she was transferred from the FPB to another Bureau, she was not paid to "act up" as the head of the FPB due to Paxton's and Ellis' absences, she received a forty-hour suspension, and she was subjected to three investigations based on allegedly false allegations, and allegedly instigated by racial animus. Plaintiff also complains that she was falsely accused of creating overtime for the FPB inspectors in order to pad their wages, and that she was falsely accused of cheating on a promotional exam and as a result, failed the exam and did not receive the promotion. In addition, Plaintiff states the following: she has been subject to approximately seventeen investigations or write ups from 2004 to 2006; her computer was tampered with, files were removed, and records related to the alleged missed inspections disappeared; CDF officers made racist allegations about her to Krivda in the course of Krivda's investigation; and only Krivda's interviews with African-American inspectors were tape-recorded, not her interviews with white officers.

Defendant argues that Plaintiff cannot establish a prima facie case of hostile work environment based on these events because she cannot demonstrate they were based on race, and cannot demonstrate an atmosphere of "severe" or "pervasive" racial animus.[10]

---

R. Civ. P. 56(c)(3). The Court has no duty to comb the voluminous record in this case for the allegedly numerous acts of hostile work environment Plaintiff only vaguely alludes to, but considers only the materials cited by the parties. *See In re Morris*, 260 F.3d at 665; *Braithwaite v. Sec'y of Dep't. of Homeland Sec.*, 699 F. Supp. 2d 949, 962 (N.D. Ohio 2010) ("A district court need only consider the evidence presented to it when considering a motion for summary judgment, *regardless* of whether other potentially relevant evidence exists somewhere in the record.") (quoting *Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010)).

[10]Defendant also argues that Plaintiff cannot demonstrate a hostile work environment because she could not demonstrate that any of the actions of which she complains constituted adverse employment actions, or that she was treated differently than similarly-situated co-workers on the basis of

The Court agrees that Plaintiff fails to demonstrate that the allegedly hostile or harassing actions were based on race. As the Court has discussed in Section III(A)(1), above, Plaintiff's purported evidence that Paxton initiated the PSU and CDP investigations out of racial animus is inadmissible hearsay. Likewise, Plaintiff's purported evidence that Brown sustained her disciplinary charges and suspension out of racial bias is inadmissible hearsay. There are only three other suggestions of race in the whole of Plaintiff's harassment argument: her allegation that Ellis expressed racial animus, her allegation that CDF officers made racist allegations to Krivda during Krivda's investigation, and her complaint that only Krivda's interviews with the African-American officers were tape-recorded.

Plaintiff presents no evidence regarding her claim that only the interviews with the African-American officers were tape recorded. Thus, the whole of Plaintiff's evidence that the allegedly hostile or harassing conduct was based on race consists of five statements: a statement by Laura Fox, Ellis' secretary, that Ellis has referred to the African-American FPB inspectors as "the other race," Pl.'s Mem. Opp'n Page ID #5030; Fox Dep. 50–52, ECF No. 108, and four statements made to Krivda during her investigation by Ellis, Janet Hedges (a former FPB secretary), BC Charles Campbell, and Union President Jack Reall.[11]

_____

race. Def.'s Mot. Summ. J. Page ID #672, ECF No. 81. Those two elements are not part of the prima facie case for hostile work environment, and the Court therefore does not consider them.

[11]Ellis admitted in his deposition that he had told Krivda that Plaintiff "thinks she's the civil rights leader and she's not," but explained the statement was taken out of context. Pl.'s Mem. Opp'n Page ID #5033; Ellis Dep. 61, ECF No. 107. In addition, Plaintiff alleges that Krivda's interview notes show that Hedges stated to Krivda that Plaintiff "pulls the race card;" at her deposition, however, Hedges did not remember making that statement. Hedges Dep. 43–44, ECF No. 93. Plaintiff alleges that Krivda's interview notes show that Campbell stated to Krivda that: (1) "the belief is that a black person can file EEO against whites and it will [fly] . . . but white filing against black won't fly;" (2) "With [Plaintiff]—it always seems to be her against the white guy—she'll defend the black inspectors to the hilt, but not the white

None of these alleged statements, however, establish that any of the allegedly harassing conduct about which Plaintiff complains was "based on race."[12]  Moreover, even if Plaintiff had established that the conduct of which she complains was based on race, she presents no evidence that it unreasonably interfered with her work performance or made it more difficult to do her work.  Plaintiff also presents no evidence that Defendant failed to take reasonable care to prevent and correct any harassing behavior.  To the contrary, as the Court has noted, Defendant responded promptly to Plaintiff's discrimination complaint, and took her allegations seriously enough to assign the investigation into them to an independent party, an "unprecedented" decision, as Plaintiff herself argues.  Defendant's actions in this regard were entirely consistent with its legal obligation to exercise reasonable care to prevent and promptly correct any harassing behavior.  *See Russell*, 537 F.3d at 608; *see also Faragher*, 524 U.S. at 807; *Risinger v. Ohio Bur. of Workers' Comp.*, 883 F.2d 475, 482–83 (6th Cir. 1989) (employer has a duty to undertake prompt investigation and provide remedy after being on notice of racial harassment or discrimination); *see also Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001) (with regard to sexual harassment, "[n]otice of the sexually harassing conduct triggers an employer's duty to

_____

ones;" and (3) "There is a race problem in FPB—the black people there truly feel it is their office and no one else should really tell them what to do.  They feel white people are against them."  Campbell Dep. 39–46, ECF No. 97.  Campbell does not recall making these statements and stated that he does not agree with them.  *Id.*  He does recall stating to Krivda that Plaintiff stated, at a black history event, "It's our turn to take over this Fire Department (referring to black people)."  *Id.* at 43–45.  Finally, Reall stated in his letter to Krivda before she began her investigation that Plaintiff "frequently plays the race card," meaning that she frequently accused Reall or the union of being racist.  Reall Dep. 101–02, ECF No. 95.

[12]Additionally, to the extent Plaintiff attempts to assert a claim of racially hostile work environment based entirely on the Krivda investigation, on the basis of the four statements made to Krivda, she presents no authority suggesting that Defendant could even be held responsible for statements made to a third party, in the context of an investigation conducted by that third party.

take prompt corrective action that is 'reasonably calculated to end the harassment.'").

For the above reasons, Plaintiff thus fails to establish a prima facie case of racially hostile work environment.

## C. Retaliation

Plaintiff asserts that Defendant retaliated against her for complaining of discrimination in violation of Title VII and the Ohio Revised Code.  Title VII prohibits an employer from discriminating against any employee . . . "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  As with Plaintiff's race discrimination and hostile work environment claims, Plaintiff's claim for retaliation under § 4112.02 is evaluated using the same evidentiary standards and analysis as her Title VII claim.  *See Satterfield*, 736 F. Supp. 2d at 1165–66.

The Sixth Circuit recognizes that retaliation may take the form of materially adverse employment actions or a hostile work environment.  *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000); *Allen*, 697 F. Supp. 2d at 902–03.  To establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) she engaged in an activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant subjected plaintiff to a materially adverse employment action or severe and pervasive retaliatory harassment by a supervisor; and (4) a causal connection exists between the protected activity and the materially adverse action or harassment.  *Morris*, 201 F.3d at 792; *Russell*, 537 F.3d at 609.

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its action. *Morris*, 201 F.3d at 792–93. If the defendant carries this burden, the plaintiff, who bears the burden of persuasion throughout the entire process, must then demonstrate that the defendant's proffered reason was not the true reason for the employment decision. *Id.* at 793.

### 1. Adverse Action Retaliation

Title VII's anti-retaliation provision, "unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Rather, in the context of a Title VII retaliation claim, an employment action is considered to be materially adverse if it would have deterred a reasonable employee from making or supporting a charge of discrimination. *Id.* at 68. Material adversity is distinct from a trivial harm, however; as the *Burlington Northern* court emphasized, Title VII "does not set forth 'a general civility code for the American workplace.'" *Id.* Thus, "an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* (citation omitted).

Defendant does not dispute that Plaintiff satisfies the first element of the prima facie case, since she filed or allegedly filed the following complaints: (1) OCRC Charge No. 31718, dated January 10, 2005, regarding DC Butcher's false accusations that she had cheated; (2) the May 4, 2005 memo to Chief Pettus entitled "Disparate Treatment and Policy Violations,"  (3) OCRC Charge No. 33447/EEOC Charge No. 22A-2007-01791C, dated August 10, 2006, and (4) OCRC Charge No. 36100, dated

September 19, 2008.  Pl.'s Mem. Opp'n Page ID #5019.  Defendant also does not dispute that Plaintiff satisfies the second element of the prima facie case, that the exercise of her protected rights was known to Defendant.

Defendant, however, argues that it is entitled to summary judgment on Plaintiff's adverse action retaliation claim because Plaintiff fails to satisfy the remaining elements of the prima facie case.  Defendant argues that the multiple investigations Plaintiff points to as evidence of retaliation are not materially adverse employment actions, and that it had a legitimate, non-discriminatory reason for the one admittedly adverse employment action that was taken against Plaintiff, her forty-hour suspension.  Defendant also argues that Plaintiff failed to show a causal connection between the filing of her EEOC charges and any materially adverse action taken by Defendant.

The Court first notes that Plaintiff's Title VII retaliation claim consists only of the vague and conclusory statement that "she suffered consequences where others did not, simply because she was black, and also had outed Paxton's absences and complained of discrimination and retaliation both to the City officials and the EEOC."  Pl.'s Mem. Opp'n Page ID #5024.  She does not at any point elaborate on this argument or specifically identify those "consequences" she allegedly suffered in retaliation for her complaints.  Moreover, Plaintiff does not respond to Defendant's argument for summary judgment on her Title VII adverse action retaliation claim.  For this reason alone, the Court may grant summary judgment for Defendant on that claim.

Because Plaintiff does imply, however, that the Krivda investigation was conducted in retaliation for her internal complaint of discrimination, the Court will briefly address that claim.  There is, to be sure, a causal connection between Plaintiff's May

4, 2005 memorandum to Chief Pettus and the Krivda investigation. Indeed, Chief Pettus admits, as does Defendant, that the Krivda investigation "was meant to address the issue of missed inspections, the conflict within FPB and [Plaintiff's] claim of racial discrimination." Pettus Aff. ¶ 7, ECF No. 81–4; *see also* Def.'s Reply Page ID # 5415, ECF No. 162. Plaintiff herself directs the Court to a memorandum Chief Pettus sent to Safety Director Brown on May 9, 2005, five days after receiving her memorandum, requesting an investigation "as soon as possible" into the "very serious" accusations she had raised. Mem. from N. Pettus to M. Brown dated May 9, 2005, ECF No. 125–46.

That Plaintiff's complaint, in part, caused the Krivda investigation, does not establish that the investigation was a form of retaliation, however. The initiation of an investigation into complaints by Plaintiff deemed to be "very serious," to be conducted by an independent party, is not an adverse action for the purposes of a retaliation claim. It cannot be said that such an investigation would deter a reasonable employee from making or supporting a charge of discrimination. As noted, Defendant had a legal obligation to investigate Plaintiff's complaints. *See Faragher*, 524 U.S. at 806; *Risinger v. Ohio Bur. of Workers' Comp.*, 883 F.2d 475, 482–83 (6th Cir. 1989) (employer has duty to undertake prompt investigation and provide remedy after being on notice of racial harassment or discrimination); *see also Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1269–70 (10th Cir. 2005) ("because Title VII imposes a duty on an employer to reasonably investigate and address a plaintiff's complaints," to find that a "Do's and Don't's" memorandum circulated by the employer in response to plaintiff's complaints, in an "attempt to bring positive changes to the office," was actionable

retaliatory conduct would be an absurd result"). Plaintiff fails to present evidence that in arranging for the Krivda investigation, Defendant acted instead out of an improper retaliatory motive.

As noted, aside from the Krivda investigation, Plaintiff does not specifically identify or provide evidence of any the other "consequences" she alleges to have suffered in retaliation for her complaints. The Court has no duty to search the record for evidence to support Plaintiff's claim. *See In re Morris*, 260 F.3d at 665. Because Plaintiff has failed to cite evidence supporting, or present a cogent argument regarding her Title VII adverse action retaliation claim, therefore, the Court deems that claim to be waived. *See Sandridge*, 385 F.3d at 1035–36 ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

### 2. Retaliatory Harassment

Although the parties mention harassment frequently throughout their memoranda, they fail to cogently distinguish between adverse employment action retaliation and retaliatory harassment, or retaliatory hostile working environment. Retaliation in the form of adverse employment action and retaliation in the form of hostile work environment are distinct legal theories. *Morris*, 201 F.3d at 792; *Allen*, 697 F. Supp. 2d at 902–03.

Plaintiff, however, presents no evidence of a causal connection between her protected activity and the allegedly hostile work environment. Rather, as noted above, in arguing that she was retaliated against, Plaintiff presents only the vague and

conclusory argument that "she suffered consequences where others did not, simply because she was black, and also had outed Paxton's absences and complained of discrimination and retaliation both to the City officials and the EEOC." Pl.'s Mem. Opp'n Page ID #5024. As with her claim of adverse action retaliation, Plaintiff's claim of retaliatory harassment is raised in only a cursory manner, with no citation or development of argument. Plaintiff, therefore, also has waived that claim. *See Sandridge*, 385 F.3d at 1035–36.

## D. Retaliation for engaging in speech protected by the First Amendment, in violation of 42 U.S.C. § 1983

Plaintiff brings a claim under 42 U.S.C. § 1983 alleging that Defendant retaliated against her for engaging in speech protected by the First Amendment to the U.S. Constitution.

Defendant asserts three arguments in moving for summary judgment on Plaintiff's § 1983 claim. First, Defendant argues that any claim arising from events that occurred prior to April 2006 are barred by the two-year statute of limitations.[13] Second, Defendant argues that Plaintiff fails to allege or prove essential elements of her First Amendment retaliation claim. Finally, Defendant argues that pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the City of Columbus, as the sole Defendant, cannot properly be held liable under § 1983 for the

---

[13]Defendant actually argues that "[s]ince [Plaintiff's] lawsuit was filed in March 2008, any claims based on an event that occurred prior to March 2006 are barred by the statute of limitations." The Court notes that Plaintiff's first Amended Complaint, in which she first asserted claims for violations of 42 U.S.C. § 1983, was filed on April 23, 2008, not in March 2008. ECF No. 3. Defendant may have confused this matter with the related cases, as the initial complaints in all three related cases, 2:08–cv–262, 2:08–cv–263, and 2:08–cv–264, were filed in March 2008. The Court thus understands Defendant to be referencing Plaintiff's first Amended Complaint when referring to Plaintiff's "lawsuit," and to be arguing that claims based on events that occurred prior to *April 2006* to be barred by the statute of limitations.

conduct of its employees or agents. In response, Plaintiff argues that her claim is not barred by the statute of limitations, that she establishes the required elements, and that Defendant can properly be held liable.

The Court finds Defendant's third argument, that the City of Columbus cannot be held liable for Plaintiff's alleged § 1983 violations, dispositive, and thus finds no need to discuss Defendant's other arguments.

The City of Columbus is the sole Defendant in this action. To establish the liability of a municipality under § 1983, a plaintiff must establish that: "(1) the plaintiff's harm was caused by a constitutional violation; and (2) the city was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). The doctrine of *respondeat superior* is not available as a theory of recovery under § 1983; thus, a municipality may not be held liable for an injury inflicted solely by its employees or agents. *See Monell*, 436 U.S. at 691, 694 (1978); *see also Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Monell*). "Rather, a governmental entity may be held liable under § 1983 only when the plaintiff can demonstrate that it engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiffs' rights." *Abdulsalaam v. Franklin Cnty Bd. of Comm'rs*, 637 F. Supp. 2d 561, 577 (S.D. Ohio 2009) (citing *Monell*, 436 U.S. at 694).

To prove the existence of a municipality's illegal policy or custom, a plaintiff can look to, *inter alia*, official policies, actions taken by officials with final decision-making authority, or a custom of tolerance or acquiescence of federal rights violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). For a custom to form the basis for municipal liability, it "must be 'so permanent and well settled as to

constitute a 'custom or usage' with the force of law.'" *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Monell*, 436 U.S. at 691). A plaintiff must set forth facts showing the existence of an offending custom or policy; mere conclusory allegations are insufficient. *Barrett v. Wallace*, 107 F. Supp. 2d 949, 955 (S.D. Ohio 2000).

Additionally, a municipality can be held liable under § 1983 for a single decision by one of the municipality's policymakers, but "only when the official is the one who has the 'final authority to establish municipal policy with respect to the action ordered.'" *Feliciano*, 988 F.2d at 655 (quoting *Pembaur*, 475 U.S. at 481). A municipal employee is not a final policymaker unless his decisions "are final and unreviewable and are not constrained by the official policies of superior officials." *Id*. Similarly, a municipality can be held liable for a decision by a subordinate, if the decision was ratified by a final policymaker. *Id*. at 656. However, "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification." *Id*.

Even assuming, for the sake of argument, that Plaintiff can establish a First Amendment retaliation claim, her claim against Defendant must fail because she has presented no evidence that the City can be held responsible under *Monell*.

Plaintiff claims that in retaliation for "protest[ing] the conduct of Defendant as discriminatory and retaliatory," she (and the other plaintiff inspectors) were subjected to adverse actions intended to "chill" them from continuing to engage in protected speech. She argues that after she and the inspectors voiced their complaints, they were ordered not to talk to the media, and ordered not to congregate or discuss their complaints with each other. She alleges that she was "written up" at least six times for

seeking public records "in order to defend herself and the other plaintiffs." She alleges that she and the other plaintiffs suffered adverse actions in retaliation for their complaints in the form of the investigations conducted by the CDF, and the "aggressive attempts" of "Paxton, Ellis, Reall, Davis, Daum, et al." to "convince both the City and the media" of their guilt. Finally, she alleges that the *Dispatch* articles and her transfer from FPB to another Bureau constituted retaliation. Pl.'s Mem. Opp'n Page ID # 5037–39.

Plaintiff does not argue that she was retaliated against pursuant to either an official policy or a "custom" of the CDF or the City of Columbus, but rather that the City can be held liable under *Monell* under the ratification theory. Specifically, Plaintiff argues that "City officials, including policy-makers Brown and the Mayor, ratified the conduct of Paxton, Ellis, and even Union president Reall. It would be unfathomable to claim that the City did not engage in or endorse the actions at issue in this case." Pl.'s Mem. Opp'n Page ID #5040. That allegation, however, is purely conclusory. Plaintiff provides no evidence that Paxton's order against talking to the media, Ellis' order against congregating with other officers who filed EEOC charges, or the six write-ups she received from AC Cox for seeking public records were ratified by a policymaker. As previously discussed, Plaintiff provides no evidence of the alleged "concerted actions of Paxton, Ellis, Reall, Davis, Daum, et al. and their aggressive attempts to convince both the City and the media of the Plaintiff/inspectors' guilt," let alone evidence that these alleged actions were ratified by a policy-maker. Lastly, Plaintiff also does not provide evidence that her transfer from the FPB or the three investigations were approved by a final policymaker, that is, someone whose decisions

"are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano*, 988 F.2d at 655.

For those reasons, Plaintiff does not establish a viable claim against the City of Columbus for retaliation in violation of her First Amendment rights, pursuant to 42 U.S.C. § 1983.

## E. Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection, in Violation of 42 U.S.C. § 1983

Plaintiff's Second Amended Complaint asserts a claim under 42 U.S.C. § 1983 for the violation of her right to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution. Second Am. Compl. ¶¶ 104–105, ECF No. 71. Because she presents no argument in response to Defendant's motion for summary judgment on that claim, Plaintiff has waived her claim based on alleged violations of the Fourteen Amendment. *See Sandridge*, 385 F.3d at 1035–36. Moreover, even if she had not waived that claim, it would also fail for the reasons stated in Section III(D) above.

## F. Remaining state law claims

Having determined that Plaintiff's federal claims are subject to dismissal, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, specifically, her claims for Invasion of Privacy—False Light (Count IX), Spoliation of Evidence (Count X), and Public Records Removal/Destruction (Count XI). 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). The Court therefore will dismiss those three state law claims without prejudice.

## V.  DISPOSITION

For the aforementioned reasons, the Court **GRANTS** the City of Columbus' summary judgment motion.  ECF No. 81.  The Court **DISMISSES** the following claims **WITH PREJUDICE**: Race Discrimination in violation of Title VII and Ohio Rev. Code §§ 4112.02 & 4112.99  (Counts I & II); Hostile Work Environment in violation of Title VII and Ohio Rev. Code §§ 4112.02 & 4112.99  (Counts III & IV); Retaliation/Retaliatory Harassment in violation of Title VII and Ohio. Rev. Code §§ 4112.02(I) & 4112.99 (Counts V & VI); First Amendment Retaliation and violations of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983 (Counts VII & VIII).  The Court dismisses Plaintiff's remaining three state law claims, Counts IX–XI, **WITHOUT PREJUDICE**.

The Clerk shall remove ECF No. 81  from the Civil Justice Reform Act motions report.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**